J-S77011-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| WILLIAM JOSEPH KEMP, | |
| Appellant | No. 537 MDA 2017 |

Appeal from the PCRA Order Entered March 16, 2017
In the Court of Common Pleas of Lycoming County
Criminal Division at No(s): CP-41-CR-0000525-2012

BEFORE:  BENDER, P.J.E., LAZARUS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY BENDER, P.J.E.:            **FILED FEBRUARY 20, 2018**

Appellant, William Joseph Kemp, appeals from the post-conviction court's March 16, 2017 order denying his first petition filed under the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546.  We affirm.

In this appeal, Appellant presents the following four issues for our review:

A. Trial [c]ounsel was ineffective for failing to call character witnesses on Appellant's behalf when character witnesses were available and essential to Appellant's defense.

B. Appellant's direct appeal rights must be reinstated when [a]ppellate [c]ounsel failed to appeal an order prohibiting the introduction of statements of the Commonwealth's key witness that he was concerned about ending up in prison.

_____

[*] Former Justice specially assigned to the Superior Court.

C. Appellant was entitled to an evidentiary hearing to address the failure to object to the Commonwealth's shifting the burden of proof to Appellant by its questioning of three witnesses.

D. Trial [c]ounsel was ineffective by opening the door to Appellant's previously precluded prejudicial testimony through questioning of a defense witness.

Appellant's Brief at 4.

"This Court's standard of review from the grant or denial of post-conviction relief is limited to examining whether the lower court's determination is supported by the evidence of record and whether it is free of legal error." **Commonwealth v. Morales**, 701 A.2d 516, 520 (Pa. 1997) (citing **Commonwealth v. Travaglia**, 661 A.2d 352, 356 n.4 (Pa. 1995)). Where, as here, a petitioner claims that he received ineffective assistance of counsel, our Supreme Court has directed that the following standards apply:

[A] PCRA petitioner will be granted relief only when he proves, by a preponderance of the evidence, that his conviction or sentence resulted from the "[i]neffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543(a)(2)(ii). "Counsel is presumed effective, and to rebut that presumption, the PCRA petitioner must demonstrate that counsel's performance was deficient and that such deficiency prejudiced him." [**Commonwealth v.**] **Colavita**, 606 Pa. [1,] 21, 993 A.2d [874,] 886 [(Pa. 2010)] (citing **Strickland**[ **v. Washington**, 104 S.Ct. 2053 (1984)]). In Pennsylvania, we have refined the **Strickland** performance and prejudice test into a three-part inquiry. **See** [**Commonwealth v.**] **Pierce**, [515 Pa. 153, 527 A.2d 973 (Pa. 1987)]. Thus, to prove counsel ineffective, the petitioner must show that: (1) his underlying claim is of arguable merit; (2) counsel had no reasonable basis for his action or inaction; and (3) the petitioner suffered actual prejudice as a result. **Commonwealth v. Ali**, 608 Pa. 71, 86, 10 A.3d 282, 291 (2010). "If a petitioner fails to

- 2 -

prove any of these prongs, his claim fails." ***Commonwealth v. Simpson***, [620] Pa. [60, 73], 66 A.3d 253, 260 (2013) (citation omitted). Generally, counsel's assistance is deemed constitutionally effective if he chose a particular course of conduct that had some reasonable basis designed to effectuate his client's interests. ***See Ali, supra***. Where matters of strategy and tactics are concerned, "[a] finding that a chosen strategy lacked a reasonable basis is not warranted unless it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually pursued." ***Colavita***, 606 Pa. at 21, 993 A.2d at 887 (quotation and quotation marks omitted). To demonstrate prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." ***Commonwealth v. King***, 618 Pa. 405, 57 A.3d 607, 613 (2012) (quotation, quotation marks, and citation omitted). "'[A] reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding.'" ***Ali***, 608 Pa. at 86–87, 10 A.3d at 291 (quoting ***Commonwealth v. Collins***, 598 Pa. 397, 957 A.2d 237, 244 (2008) (citing ***Strickland***, 466 U.S. at 694, 104 S.Ct. 2052)).

***Commonwealth v. Spotz***, 84 A.3d 294, 311-12 (Pa. 2014).

In this case, we have reviewed the certified record, the briefs of the parties, and the applicable law. We have also examined the thorough and well-reasoned opinion of The Honorable Marc F. Lovecchio of the Court of Common Pleas of Lycoming County. Judge Lovecchio aptly summarizes the facts and procedural history of Appellant's case. ***See*** PCRA Court Opinion, 6/28/17, at 1-4. He then cogently addresses each of Appellant's four ineffectiveness issues, concluding that each is meritless for various reasons. ***See id.*** at 5-25. Judge Lovecchio's decision is both supported by the evidence of record, and is free from legal error. Accordingly, we adopt

- 3 -

Judge Lovecchio's opinion as our own, and we affirm the order denying Appellant's petition for the reasons set forth therein.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/20/2018

IN THE COURT OF COMMON PLEAS OF LYCOMING COUNTY, PENNSYLVANIA

COMMONWEALTH

    vs.

WILLIAM J. KEMP,
    Appellant

: No. CP-41-CR-0000525-2012
:
: CRIMINAL DIVISION
:
:
:
: 1925(a) Opinion

## OPINION IN SUPPORT OF ORDER IN COMPLIANCE WITH RULE 1925(a) OF THE RULES OF APPELLATE PROCEDURE

This opinion is written in support of this court's order entered on March 16, 2017, which denied the Post Conviction Relief Act (PCRA) petition filed by Appellant, William Kemp (hereinafter "Kemp"). The factual and procedural history follows.

On the evening of February 13, 2012, Kirsten Radcliffe, Michael Updegraff, and Thomas Schmitt were drinking at the Fifth Avenue Tavern in Williamsport. Updegraff and Radcliffe, who were boyfriend and girlfriend, got into a disagreement. Radcliffe left the Tavern and walked away down Fifth Avenue, ending up outside of Defendant William Kemp's apartment.

Twenty to thirty minutes later, Kemp gave Radcliffe a ride to the residence she shared with Updegraff at 1017 Franklin Street.

Kemp entered the residence with Radcliffe. Updegraff was upstairs and Schmitt was on a couch downstairs. When Updegraff came downstairs and saw Kemp, he asked Schmitt who the hell Kemp was. Schmitt responded that he did not know and that Ms.

1

Radcliffe had brought him. Radcliffe explained that Kemp had given her a ride home. Updegraff told Kemp to get out of his house but Kemp refused to leave. Radcliffe apologized for Updegraff's behavior and told Kemp that he should just leave.

Updegraff grabbed Kemp and pushed or shoved him into a wall and then out the door. Updegraff and Schmitt followed Kemp outside and part way down the driveway. Updegraff stopped at the end of his van (which was parked in the driveway) and Schmitt continued walking for several feet so that he was approximately midway between the end of the van and Kemp's vehicle, which was parked on Franklin Street. Throughout, Updegraff and Schmitt continued yelling at Kemp to keep going, get off the property and leave.

Kemp continued walking quickly down the driveway to his vehicle. Instead of leaving, however, Kemp opened the door of his vehicle and grabbed his handgun. He turned back towards Updegraff and Schmitt and began firing shots as he moved towards them. One shot struck Schmitt in the neck and another was a contact or near contact shot to the back of his head.

Updegraff and Radcliffe tried to wrestle the firearm away from Kemp. While doing so, they punched and kicked Kemp repeatedly. Various neighbors saw and/or heard the gunshots and commotion and called 911. Within minutes, the police arrived and took Kemp into custody. Schmitt died as a result of his gunshot wounds.

Kemp was charged with, among other things, third degree murder, two counts of aggravated assault, possession of instrument of crime, and two counts of recklessly endangering another person. A jury trial commenced on September 9, 2013. On September 17, 2013, the jury returned verdicts of guilty on all charges.

2

Following a hearing on January 29, 2014, the trial court sentenced Kemp to a term of imprisonment of 20 to 40 years. Kemp filed a timely post-sentence motion on February 7, 2014, which the trial court denied on June 9, 2014.

Kemp filed a timely appeal. The Pennsylvania Superior Court affirmed Kemp's judgment of sentence in a decision filed on June 8, 2015. Subsequently, Kemp filed a petition for allowance of appeal, which the Pennsylvania Supreme Court denied on February 10, 2016.

On February 29, 2016, Kemp filed a pro se Post Conviction Relief Act (PCRA) petition. The court appointed counsel to represent Kemp, and counsel filed an amended PCRA petition on June 7, 2016.

The amended PCRA petition raised five issues: (1) trial counsel was ineffective for failing to call character witnesses on Kemp' behalf; (2) trial counsel was ineffective for failing to employ and utilize an expert witness to offer a fingerprint and trace evidence analysis on the knife found at the crime scene by Corporal Dustin Reeder of the Williamsport Police Department; (3) appellate counsel was ineffective for failing to appeal to the Superior Court of Pennsylvania this court's prohibition on introducing Michael Updegraff's statements that he was concerned about ending up in prison for his role in the events of February 13, 2012; (4) trial counsel was ineffective for failing to object to the Commonwealth's questions to several witnesses which shifted the burden of proof to Kemp thus denying him a fair trial; and (5) trial counsel provided ineffective assistance by opening the door through questioning of defense witness Kristen Smith, allowing the Commonwealth to introduce rebuttal testimony concerning Kemp's statements made during a December 2009

3

dependency hearing.

The court held an argument/conference on the amended petition on June 27, 2016. In an Opinion and Order entered on October 24, 2016, the court granted an evidentiary hearing on the claims of trial counsel's ineffectiveness related to failing to call character witnesses and opening the door to rebuttal testimony concerning Kemp's statements made during a December 2009 dependency hearing. On all other claims, the court explained why it believed such claims did not warrant an evidentiary hearing or relief.

Evidentiary hearings were held on November 29, 2016 and December 2, 2016. On March 16, 2017, the court entered an Opinion and Order denying Kemp's PCRA petition.

Kemp filed a timely notice of appeal. Kemp asserts four issues on appeal: (1) the trial court erred by failing to grant a new trial because trial counsel provided ineffective assistance of counsel by not calling character witnesses on Kemp's behalf; (2) the trial court erred by failing to reinstate Kemp's direct appeal rights due to appellate counsel's failure to appeal to the Superior Court of Pennsylvania the trial court's ruling prohibiting trial counsel from introducing Michael Updegraff's statements that he was concerned about ending up in prison for his role in the events of February 13, 2012; (3) the trial court erred by denying Kemp's request for an evidentiary hearing on the issue of trial counsel's ineffective assistance in failing to object to the Commonwealth's questions of several witnesses which shifted the burden of proof to Kemp thus denying him a fair trial and by failing to grant a new trial due to trial counsel's error; and (4) the trial court erred by failing to grant a new trial because trial counsel provided ineffective assistance by opening the door through questioning of defense witness Kristen Smith allowing the Commonwealth to introduce testimony

4

concerning Kemp's statements made during a December 2009 dependency hearing.

## DISCUSSION

In analyzing claims of ineffective assistance of counsel, the court presumes that counsel was effective unless the PCRA petitioner proves otherwise. *Commonwealth v. Cox*, 983 A.2d 666, 678 (Pa. 2009). In order to succeed on a claim of ineffective assistance of counsel, the petitioner must prove the following: (1) that the underlying claim is of arguable merit; (2) that counsel's performance lacked a reasonable basis; and (3) that the ineffectiveness of counsel caused the petitioner prejudice. *Id; see also Commonwealth v. Fulton,* 83 A.2d 567, 572 (Pa. 2003); *Commonwealth v. Faurelus*, 147 A.3d 905, 911 (Pa. Super. 2016).

"Where the underlying claim lacks arguable merit, counsel cannot be deemed ineffective for failing to raise it." *Commonwealth v. Jarosz*, 2016 PA Super 281, 2016 Pa. Super. LEXIS 757, *5 (December 13, 2016), citing *Commonwealth v. Koehler*, 36 A.3d 121, 140 (Pa. 2012). All three prongs must be proven and a petitioner's failure to prove any one prong results in the ineffectiveness claim being deemed without merit. *Jarosz, id.; Commonwealth v. Daniels*, 963 A.2d 409, 419 (Pa. 2009).

Kemp first asserts that the court erred by failing to grant a new trial with respect to trial counsel's failure to call character witnesses. At the evidentiary hearings, Kemp presented testimony from two individuals that Kemp asserted trial counsel should have called as character witnesses at trial, Gerald Zeidler and Amy Embick.

Kemp contended that trial counsel should have called Gerald Zeidler to testify about his character for truthfulness and nonaggressive or nonviolence. Mr. Zeidler was a

5

longtime friend and former coworker of Kemp's. He is presently employed as a police officer in Bloomsburg.

With respect to Kemp's reputation in the community for truthfulness, both prior to and after the murder, Mr. Zeidler testified that Kemp's reputation was that he was "honest to a fault." According to Mr. Zeidler, all of Kemp's friends considered Kemp to be truthful and honest. Kemp's sister, Amy Embick, also testified about his reputation for truthfulness.

The Commonwealth objected to any testimony regarding Kemp's reputation in the community for truthfulness. The Commonwealth argued that such testimony was not relevant or admissible in this case, because the Commonwealth did not attack at trial Kemp's reputation for truthfulness and honesty.

The court initially reserved its decision with respect to this argument, but agreed with the Commonwealth when it ruled on this issue.

During the trial in this matter, Kemp was extensively cross-examined about his version of the events. The Commonwealth clearly attacked the credibility of Kemp's version of the events. However, the Commonwealth did not attack Kemp's community reputation for truthfulness generally. Furthermore, Kemp's reputation for truthfulness was not pertinent to any of the underlying criminal offenses.

"[W]here the prosecution has merely introduced evidence denying or contradicting the facts to which the defendant testified, but has not assailed the defendant's community reputation for truthfulness generally, evidence of the defendant's alleged reputation for truthfulness is not admissible." *Commonwealth v. Kennedy*, 2016 PA Super

6

273, 2016 Pa. Super. LEXIS 734, *23 (December 6, 2016)(quoting *Commonwealth v. Constant*, 925 A.2d 810, 823 (Pa. Super. 2007), overruled on other grounds, *Commonwealth v. Minnis*, 80 A.3d 1047 (Pa. Super. 2014) (*en banc*)).

In other words, when truthfulness is not relevant to the underlying criminal offenses, a defendant may only call witnesses to testify as to his truthfulness when (a) he chooses to testify on his own behalf; and (b) the Commonwealth attacks the defendant's truthfulness through cross-examination or by other witness' testimony. *Kennedy, id.* (citing *Commonwealth v. Minich*, 4 A.3d 1063, 1070 (Pa. Super. 2010)). While Rule 608 (a) of the Pennsylvania Rules of Evidence permits a testifying defendant to call witnesses to testify as to his truthful character whenever the Commonwealth attacks his general reputation for truthfulness during trial, Rule 404(A)(2)(a) permits a defendant to call a witness to testify as to his truthful character only when the defendant's reputation for truthfulness is pertinent to the underlying criminal offense.

Kemp did not argue that the Commonwealth attacked his general reputation for truthfulness, and the court's review of the record revealed no such attack on his general reputation for truthfulness. Accordingly, Kemp was not entitled to call character witnesses to testify to his truthfulness.

Mr. Zeidler and Ms. Embick also testified with respect to Kemp's reputation for being a nonaggressive or nonviolent person.

Mr. Zeidler testified that Kemp had a universal reputation of being a nonaggressive and nonviolent person both before and after the murder charge.

After seeing a television news report about the murder, Mr. Zeidler visited

7

Kemp at the Lycoming County Prison. They discussed Mr. Zeidler being a character witness. During the trial, from September 9 through September 17, 2013, Mr. Zeidler would have been available to testify "depending on the day." He could not recall his work schedule. He did remember receiving a telephone call at one time from a representative of the defense team but never heard from that person again. He was not subpoenaed or asked to be present at trial and accordingly did not attend.

He did clearly indicate, however, that if he would have been subpoenaed he would have been present and even if he had not been subpoenaed he was willing to testify as long as there was no emergency at work requiring "all available law enforcement personnel" to be present.

He could not recall the specific date and time that he discussed his possible testimony with a member of the defense team but he did recall receiving a voicemail and then returning the call. He did end up speaking with, he believes, "Mr. Miele" but could not recall the entire conversation.

Regarding Kemp's reputation in the community for being a nonaggressive and nonviolent person, Mr. Zeidler was extensively cross-examined regarding specific alleged incidents of violence and aggression including but not limited to Kemp threatening to kill himself, Kemp threatening to harm someone, Kemp pulling a knife on someone at Wegmans, Kemp talking to a mental health professional for aggressive behavior, Kemp refusing to follow the directives of constables, Kemp slapping his wife in the face because she woke him up, Kemp allegedly slapping or choking Kristin Smith, and Kemp carrying a firearm because he did not want to get into a fight that he would not lose. Mr. Zeidler was not aware of any of

8

these incidents or allegations.

Kemp's sister, Amy Embick, also testified at the PCRA hearing about Kemp's reputation for being peaceful and nonviolent. She testified that "everybody I ever talked to said he was nonviolent." She added that his reputation for being nonviolent did not change after the charges were filed. Following the charges, Ms. Embick's husband would not allow her to have any contact with her brother. Kemp, however, contacted Ms. Embick and asked her to testify as a character witness.

Ms. Embick recalled having representatives of both the Commonwealth and the Public Defender's office speak with her regarding Kemp's reputation for violence or nonviolence. She remembered speaking with Bill Miele. After she ended up speaking with him, however, he never contacted her again.

While her husband would not allow her to attend the trial, Ms. Embick testified that she would have testified for Kemp if she had been subpoenaed. Ms. Embick testified that although her husband was "abusive and controlling" and he essentially would not allow her to leave the house, he could not have stopped her from attending and testifying if she was subpoenaed. Trial counsel, though, never subpoenaed her.

Ms. Embick was also cross-examined by the Commonwealth regarding the numerous specific incidents of violence with which the Commonwealth cross-examined Mr. Zeidler. She conceded on cross-examination that she was of the opinion that her brother shot and killed the other individual because he had no choice. She noted that Kemp's reputation amongst his friends was that he would not do anything unless "he had to." She clarified that unless Kemp thought that he was threatened, his kids were being threatened or a family

9

member was being threatened, he would not resort to violence.

Kemp was represented at trial by William Miele and Robert Cronin. Mr. Cronin testified that the defense focus was first self-defense and alternatively heat of passion for voluntary manslaughter. He conceded that Kemp's reputation for truthfulness was not as much of an issue, although Kemp's reputation for being non-violent and peaceful was "a concern" and directly related to Kemp's claim of self-defense. Prior to trial, Mr. Cronin met with Kemp on numerous occasions. Among other things, they discussed character witnesses. Kemp wanted to call character witnesses and gave to Mr. Cronin specific names and as much contact information as "he could."

Mr. Cronin did not recall being told that Kemp's sister Amy Embick was willing to testify, although he did speak with Mr. Zeidler. According to Mr. Cronin, Mr. Zeidler indicated that he was not willing to testify because of his employment as a police officer and "did not want to get involved." According to Mr. Cronin, Mr. Zeidler would not cooperate and accordingly, it was decided not to even attempt to utilize him as a character witness.

In fact, the defense decided not to call any character witnesses for two reasons. First, it would open the door to specific instances of violence which the defense wanted to keep out and second, a majority if not all of the proposed character witnesses were "not valid character witnesses." In other words, they could testify as to their own impressions but not as to Kemp's reputation in the community.

Mr. Cronin recalled speaking to Kemp about this "trial strategy" not to call character witnesses. He recalled Kemp noting that he had faith in "our defense" and that he

10

would "listen" to his attorneys.

Mr. Cronin explained in his testimony that the defense team was particularly concerned that if reputation witnesses were called, they could be cross-examined regarding Kemp: pulling a knife for no valid reason; regularly carrying a gun; having a permit to use a gun; carrying the gun because he did not want to get into a fight that he might lose; getting into incidents his mother; and using a weapon in a public place against an unarmed person. Mr. Cronin explained that if all of these specific incidents were brought out before a jury, the defense was extremely concerned that Kemp "was likely to get convicted of first degree murder." In Mr. Cronin's opinion, these incidents showed a specific propensity for violence.

On cross-examination, Mr. Cronin admitted that there were numerous other incidents that may have been admitted and which would have clearly been detrimental to Kemp including, but not limited to, Kemp doing the following: making suicidal threats; threatening to blow his brains out; wanting to harm his mother; talking to mental health workers regarding incidents and threats; slapping his wife; and choking Kristen Smith. As a supplement, the Commonwealth introduced as exhibits numerous police reports that referenced alleged acts of violence by Kemp.

While Mr. Cronin was not sure that all of the proffered bad acts evidence would be admitted as evidence, he knew that much of it would and that for strategic purpose the defense was not willing to risk calling any character witnesses. He was concerned that calling character witnesses would open the door and essentially lead to a first degree homicide conviction.

Kemp testified at the evidentiary hearing held on December 2, 2016. He

11

testified that he and Mr. Cronin specifically talked about character witnesses soon after Mr. Cronin became involved. At first Mr. Miele and Ms. Longo were representing Kemp and then Mr. Cronin took over for Ms. Longo. According to Kemp, "it was an ongoing discussion between" them and his attorneys "were aware of [it] for the duration."

He provided to his attorneys, on an ongoing basis, names and some contact information for character witnesses. He "absolutely" wanted to utilize character witnesses.

He noted that at the "onset of trial" his attorneys were concerned about calling character witnesses in that the "Children & Youth stuff" would come out. During trial, character witnesses were not called and, according to Kemp, this was "a very sore point." It was his understanding that the decision was made not to call character witnesses because of the concern that the Children & Youth statements would come in. The "only reason" his counsel ever gave him for not calling character witnesses was "the potential admission of the 2009 Children & Youth statements."

The court found that, although character evidence in and of itself can raise reasonable doubt in a jury's mind, and may be the only evidence available to a defendant in some cases,[1] trial counsel had a reasonable basis for not calling character witnesses in this particular case. By calling character witnesses for peacefulness and nonviolence, Kemp would have opened the door not only to the statements at the 2009 Children and Youth hearing but a host of other specific instances of violent conduct by Kemp. As the Commonwealth did quite effectively during cross-examination of the character witnesses during the PCRA hearing, each of the character witnesses could have been questioned

---

[1] See *Commonwealth v. Luther*, 463 A.2d 1073, 1077 (Pa. Super. 1983).

12

regarding close to, if not more than, ten specific incidents of violent and non-peaceful behaviors by Kemp.

It was certainly reasonable for defense counsel to want to avoid such. As Mr. Cronin testified, Kemp was facing a first degree homicide charge. The strategy was to hopefully obtain an acquittal based on self-defense or, at the most, a voluntary manslaughter conviction. Opening the door would expose the jury to evidence extremely prejudicial to Kemp.

The court believes that testimony about an incident that occurred at Wegman's grocery store would have been particularly harmful. Kemp and his children were shopping and one of his children was pushing the cart. When another individual inadvertently bumped his cart into the cart Kemp's child was pushing, Kemp pulled a knife out of his pocket and was ready to attack the individual. The court precluded the Commonwealth from presenting evidence about this incident in its case in chief but if the defense had presented character witnesses regarding Kemp's reputation for peacefulness and nonviolence, the court would have found that the defense opened the door to evidence regarding this incident. The court believes this incident would have been particularly harmful to Kemp's defense because it shows how much Kemp overreacts to trivial incidents and slights and how skewed his concept of "self-defense" is that he was ready to use deadly force in a situation where clearly there was no threat of death or imminent serious bodily injury.

Further, the court could not conclude that Kemp was prejudiced by trial counsel's failure to call character witnesses. In the context of an ineffective assistance of counsel claim, prejudice means a reasonable probability that the outcome would have been

13

different. *Commonwealth v. Johnson,* 139 A.3d 1257, 1284 (Pa. 2016). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* The failure to call character witnesses in this case was part of counsel's overall trial strategy, and the court cannot conclude that there is a reasonable probability that the jury verdict would have been more favorable to Kemp if the character witnesses had been called.

The character witnesses were a family member and a friend, who were not aware of any of the specific incidents that the Commonwealth questioned them about on cross-examination. Given this lack of awareness, the witnesses' bias in favor of Kemp, and the testimony of the neutral, residents of Franklin Street whose testimony contradicted Kemp's version of the events surrounding the victim's death, it is unlikely that the jury would have completely acquitted Kemp or even found him guilty of an offense lesser than third degree murder. If anything, opening the door to specific instances of aggressive and non-peaceful conduct could have put Kemp more at risk of a first degree murder conviction.

Kemp next asserts that the trial court erred by failing to reinstate his direct appeal rights due to appellate counsel's failure to appeal the trial court's ruling prohibiting trial counsel from introducing Michael Updegraff's statements that he was concerned about ending up in prison for his role in the events of February 3, 2012.

Appellate counsel is not required to raise all non-frivolous claims on appeal. Rather, appellate counsel may select to raise those issues that maximize the likelihood of success on appeal. Thus, "arguably meritorious claims may be omitted in favor of pursuing claims which, in the exercise of appellate counsel's objectively reasonable professional judgment, offer a greater prospect of securing relief." *Commonwealth v. Lambert,* 797 A.2d

14

232, 244 (Pa. 2001). "Generally, only when ignored issues are clearly stronger than those presented will the presumption of effective assistance of counsel be overcome." *Commonwealth v. Jones*, 815 A.2d 598, 367-368 (Pa. 2002)(quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986), which was quoted with approval in *Smith v. Robbins*, 528 U.S. 259, 288 (2000)). Kemp has not made any allegations or arguments to show this issue was stronger or had a greater chance for success than the issues raised by appellate counsel.

Furthermore, the court precluded Mr. Updegraff's statement, because trial counsel was misconstruing it and taking it out of context. N.T., September 10, 2013, at 55-57. Kemp's current argument is still misconstruing the statement and taking it out of context. Mr. Updegraff's statement did not express concern about ending up in prison for his role in the events of that evening but about whom Kemp may be "running with" and what Mr. Updegraff might have to do to protect himself. The full context of Mr. Updegraff's statement is as follows:

MICHAEL UPDEGRAFF: So I don't understand here, here's what – see I got a couple of things to look at here. First of all to make sure you guys don't twist this thing wrong and I got a f—ing problem, which I don't see happening, but whatever. Also I got to worry about his dumb a— and who he is. You know what I'm saying? I mean for him to jump off the band wagon like that and do something like that.

DETECTIVE STEVEN SORAGE: You're talking about the guy with the gun?

MICHAEL UPDEGRAFF: Yeah.

DETECTIVE STEVEN SORAGE: Okay.

MICHAEL UPDEGRAFF: I don't know where he's from, I know he's from Fifth Avenue area, apparently, I don't know sh-t about him.

DETECTIVE STEVEN SORAGE: How do you know he's from the Fifth Avenue area?

MICHAEL UPDEGRAFF: Because that's where she walked from there so apparently she picked this dumb a— up somewhere along the line. I know nothing about this mother f—er.

DETECTIVE STEVEN SORAGE: Okay.

15

MICHAEL UPDEGRAFF: You understand? But I imagine it's from there —

DETECTIVE STEVEN SORAGE: All I've heard is his first name's [B]ill, that's all I know right now, I don't know a last name, I don't know anything else about him.

MICHAEL UPDEGRAFF: Well we'll all find that out later, but I don't know nothing (sic) about this guy. So you know, I mean if he has enough balls to do some stupid a— moron bullsh— like this, then you know I got to look at my avenue like, you know, who's he running with? And you know – so whatever. But, you know, I'm 51 years old and I kept my a— out of any penitentiary. Did a lot of county, but I'm not going penitentiary bound, so I don't expect to sit my a— in a f—ing cage somewhere the rest of my entire life.

DETECTIVE STEVEN SORAGE: No.

MICHAEL UPDEGRAFF: So I'm not going to f—ing go after these mother f—ers, but they step on my land I want to make sure that I'm covered here, you understand what I'm saying.

DETECTIVE STEVEN SORAGE: I understand.

MICHAEL UPDEGRAFF: I don't know who these guys are, you know what I mean? I mean he's got nothing else to do something like this, who's he running with? You following me?

DETECTIVE STEVEN SORAGE: Yep.

MICHAEL UPDEGRAFF: Which I'm going to find out, and I'll slap that on down the line who he's running with, because apparently these mother f—ers are nuts. That's crazy what he did.

Transcript of videotaped interview of Michael Updegraff on February 14, 2012, at 59-60.

Kemp also has failed to establish the third prong of the ineffectiveness test. Kemp has not made any allegations or arguments to even suggest that there is a reasonable probability that the outcome of the appeal would have been different, i.e. that his conviction would have been overturned, but for counsel's alleged ineffectiveness. Unsupported speculation, which is what Kemp has presented here, does not establish a reasonable probability that the outcome of the appeal would have been different, as required to establish the prejudice prong of a claim of ineffective assistance of counsel. *Commonwealth v. Charleston*, 94 A.3d 1012, 1026 (Pa. Super. 2014).

16

Kemp also contends the trial court erred by denying his request for an evidentiary hearing on the issue of trial counsel's ineffective assistance in failing to object to the Commonwealth's questions of several witnesses which shifted the burden of proof to Kemp thus denying him a fair trial and by failing to grant a new trial due to trial counsel's error.

The admissibility of evidence is a matter for the discretion of the trial court. "An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias or ill-will, or such lack of support so as to be clearly erroneous." *Commonwealth v. McClure*, 144 A.3d 970, 975 (Pa. Super. 2016)(quoting *Commonwealth v. Poplawski*, 130 A.3d 697, 716 (Pa. 2015)).

Kemp claims that the Commonwealth's questioning of certain witnesses shifted the burden of proof by allegedly implying to the jury that Kemp had the burden to prove that he was innocent of the crimes charged. (Amended PCRA Petition, para. 137). The court found that Kemp's claim in this regard had no arguable merit.

There was no support for a claim that the questions infringed on the Kemp's Fifth Amendment rights, that the Kemp was compelled to give evidence against himself, that Kemp was compelled to produce incriminating evidence or that Kemp had the burden of proving innocence. Indeed, the court's instructions to the jury at each stage of the proceedings, i.e., during jury selection, prior to evidence being taken and final instructions, all made it crystal clear that the Commonwealth had the burden of proof and Kemp had no burden whatsoever.

17

All of the questions which Kemp contended were objectionable were clearly admissible to refute his claim of self-defense. Kemp raised the claim during his opening statement and the entire defense was premised on self-defense. The questioning was designed to show that Kemp's statements changed as the case went on to add factual assertions to support a claim of self-defense. In fact, most of the questions focused on the fact that in his initial statements on the night of the incident Kemp did not mention that anybody had threatened him, displayed a knife or gun, or even said the words gun or knife. The questioning did not shift any burden of proof. The questioning was utilized to attack Kemp's credibility which was clearly within the province of the Commonwealth.

Kemp's final assertion is that the trial court erred by failing to grant a new trial because trial counsel provided ineffective assistance through certain questioning of defense witness Kristen Smith which allowed the Commonwealth to introduce testimony concerning statements Kemp made during a December 2009 dependency hearing.

Kristin Smith testified on September 16, 2013. Kemp had previously been her boyfriend. They were together for three years, including on the date of the incident on February 13, 2012. (Trial Transcript, 9/16/ 2013, at 3).

During her testimony, she was asked by defense counsel whether she was aware that there was a firearm in Kemp's SUV. She indicated that she was so aware. She was then specifically asked: "Do you know why he kept it in the SUV?" She answered "I didn't want it in my house." She elaborated further that Kemp "always had the firearm" and that "it had been in the vehicle for quite a while." (Trial Transcript, 9/16/ 2013, at 9-10).

Upon cross-examination, the Commonwealth asked Ms. Smith: "Okay, now

18

you had indicated that the only reason why the gun is not in the house is because you wouldn't let the gun in the house, and he never did anything that would lead you to believe that he would use it in the commission of a crime; is that right?" To which Ms. Smith answered "correct." (Trial Transcript, 9/16/2013, at 14).

Subsequently, over Kemp's objection, the court held that the defense opened the door to Kemp's prior statements from a dependency hearing. The court permitted the Commonwealth to present testimony that when asked why he carried a gun, Kemp stated that he did not have any desire to get into a fight that he could not win and what was the point of having guns and the permit to carry if [he was] not going to use it.

More specifically, the Commonwealth was permitted to introduce statements Kemp made at a September 2009 dependency hearing on a petition filed by the Clinton County Children & Youth Services, at which Kemp, explaining why he carries a gun and knife, stated "well, honestly, because I have a right to; and I feel like I should exercise [it]. And what's the point in having the guns and the permit to carry if you are not going to make use of it... if I don't have the .45 on my hip, I would have a knife in my pocket at almost all times."

The court specifically permitted the Commonwealth to introduce the challenged statements to rebut Ms. Smith's testimony. Ms. Smith testified that Kemp kept a gun in his car because the weapon was not permitted in her residence. The court reasoned that this testimony opened the door for the Commonwealth to rebut this evidence with Kemp's own statements about why he kept a gun in the vehicle. On direct appeal, the Superior Court found no abuse of discretion in this court's determination that Kemp's prior statements were

19

permissible to rebut the inference that if Ms. Smith had permitted Kemp's gun to be kept in her house, Kemp would not have kept the gun with him in the car. (Superior Court Opinion at 15)

During trial, Mr. Cronin was acutely aware of the fact that the Commonwealth wanted the Children & Youth statements to come in. Indeed, the Commonwealth vehemently argued previously during the trial that Kemp had opened the door or that the statements should come in for other reasons. The court rebuffed the Commonwealth attempts and precluded the testimony.

Mr. Cronin testified that when he was questioning witnesses, he was "on eggshells so as not to open the door." When he called Ms. Smith and asked her the question regarding why Kemp kept the gun in the SUV, his purpose was to elicit testimony that Kemp did not "intend to kill or employ the gun criminally." Mr. Cronin explained that it went to either his self-defense or heat of passion arguments. He did not believe that it opened up the door. Obviously, both this court and the Superior Court disagreed.

In further explaining his reasoning, Mr. Cronin argued that he wanted testimony to show that the gun was always kept in the car and that when Kemp left the house that night, he did not leave with any criminal intent. He was concerned that the Commonwealth would argue that Kemp left with the gun in his car and that by doing so he intended to use it in any confrontation. Again, Mr. Cronin was particularly concerned about a first degree murder conviction.

While not believing that it would open the door, only "get me to the door without opening it," Mr. Cronin evaluated which was the higher priority. Specifically,

20

keeping out the statements or causing reasonable doubt with respect to Kemp's intent.

Further, in retrospect, Mr. Cronin argued that the statements were not that harmful and did not "ultimately lead" to the conviction. He noted that Mr. Miele ably addressed the statements in his closing arguments and, in Mr. Cronin's opinion, "overcame any prejudice."

The Pennsylvania Supreme Court has concluded that "counsel's chosen strategy lacked a reasonable basis only if the petitioner proves that the alternative strategy not selected offered a potential for success greater than the course actually pursued." *Commonwealth v. Elliott*, 80 A.3d 415, 427 (Pa. 2013).

"Generally, where matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he chose a particular course that has some reasonable basis designed to effectuate his client's interest." *Commonwealth v. Colavita*, 993 A.2d 874, 887 (Pa. 2010). "A finding that a chosen strategy lacked a reasonable basis is not warranted unless it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually pursued." *Id.*

Although trial counsel opened the door to the admission of Kemp's statements from the 2009 dependency hearing, the court could not find that Kemp was entitled to a new trial as a result thereof.

First, counsel had a reasonable, strategic basis for his actions. Kemp was charged with an open count of homicide, and the District Attorney was strenuously advocating for a first degree murder conviction. Trial counsel wanted to show that Kemp did not intentionally take the gun and place it in his vehicle before driving Ms. Radcliffe to her

21

residence at 1017 Franklin Street. Counsel's first priority was making sure Kemp was not convicted of first degree murder.

Second, the jury could reasonably interpret the statements as Kemp possessed the gun and knives for self-defense. As the court noted in its decision on the motion in limine, Kemp indicated that he had the right to carry guns, he had a permit to carry guns, and he carries guns because of concerns about being attacked. Furthermore, in the statement "what's the point in having the guns and the permit to carry if you're not going to use it," the phrase "if you're not going to use it" referred to using the permit to carry guns in his vehicle and on his person, and not using the guns to murder people.

Third, the statements were introduced for limited purposes, i.e., to show other or additional reasons why Kemp had the gun in his vehicle, to evaluate the credibility of Kirstin Smith's testimony, and to rebut the inference that the only reason Kemp had the gun in the vehicle that night was because Ms. Smith would not permit him to keep the gun in their apartment. The statements were not admitted to show Kemp's intent or malice, and the statements were not utilized in that manner at trial. In fact, the District Attorney did not even mention these statements in his closing argument.

Kemp also did not meet his burden to show that he was prejudiced by counsel's actions. "To show prejudice the petitioner must demonstrate that there is a reasonable probability that, but for counsel's alleged unprofessional conduct, the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Commonwealth v. Johnson*, 139 A.2d 1257, 1284 (Pa. 2016).

22

The court's confidence in the outcome of this case was not undermined. There were multiple, independent third party witnesses who testified that the victim and Mr. Updegraff were not chasing or attacking Kemp when he retrieved his firearm and went back onto the property to shoot the victim.

Malcolm Erb, who lived next door, testified that he heard Mr. Updegraff yelling at Kemp to get the f--- out of his house and off his property and he heard another voice say "I'm not going f--ing anywhere." He looked out his window and saw Mr. Updegraff stop at the rear corner of the van in the driveway, the victim stop about 15 feet past the van and Kemp walking toward his Durango. Mr. Updegraff and the victim were not chasing Kemp and Mr. Erb did not see them display any weapons. Once Kemp reached his Durango, Mr. Erb thought it was over; he thought Kemp would get into his Durango and go home. Instead, Kemp grabbed a gun from his vehicle, turned and started shooting toward the people in the driveway. Mr. Erb did not see anybody touch Kemp. (Trial Transcript, 9/10/2013, at 71-80).

Randee Halstead and her son lived across the street. They initially thought the first two shots were fireworks. When they looked outside, however, they saw Kemp and the victim facing each other and standing five or six feet apart. They heard a third shot and saw the victim fall to the ground. They did not see Kemp and the victim arguing, fighting, struggling, or charging at each other. (Trial Transcript, 9/10/2013, at 101-105, 126-129).

Brenda Dunkleburger also lived across the street from 1017 Franklin Street. She heard a lot of yelling and screaming and went to her window. She saw three people in the driveway. Two of them, Mr. Updegraff and Kemp, were pushing and shoving each other

23

next to the van. There was no punching or kicking and no one was being beaten. She did not see Mr. Updegraff or the victim in possession of a knife, gun or any other weapon. She saw Mr. Updegraff and the victim escort Kemp off of the property and then head back toward the house. She thought the incident was over and Kemp was going to leave. All of a sudden she heard gunshots. She looked and saw the flash of a muzzle. Kemp was shooting up the driveway. At the time Kemp fired the shots, neither Updegraff nor the victim were physically or verbally threatening him. She did not see or hear anything that would lead her to believe Kemp was in fear for his life. (Trial Transcript, 9/10/2013, at 158-172).

The physical evidence also supported the testimony of the Commonwealth's witnesses. The location of the shell casings and bullet marks supported the neighbor's and Mr. Updegraff's testimony that Kemp fired two shots as he returned onto the property, he shot the victim twice - once in the neck and once in the back of the head, and he fired another shot before he was disarmed. The lack of blood inside the residence supported Mr. Updegraff's testimony that he did not beat up Kemp inside the residence, but rather that he pushed or grabbed Kemp and then escorted him outside. The location of the blood outside the residence supported Mr. Updegraff's testimony that Mr. Updegraff punched and kicked Kemp to wrest the gun from Kemp's hands after Kemp shot the victim.

Furthermore, Kemp's own testimony undercut his self-defense claims. He escaped from the residence and made it safely back to his vehicle. (Trial Transcript, 9/16/2013, at 64-65.) He did not know how he ended up back on the property. (Id. at 153, 157). He claimed that he "ascertained" the situation before firing his weapon, but he testified that he did not see either the victim or Mr. Updegraff in possession of any weapon. (See id. at

24

71, 73, 88). Though Kemp testified that he could not find his car keys to drive away, he just didn't think about running away on foot from 1017 Franklin Street toward Washington Boulevard. (Id. at 64).

Finally, the court found that the facts of this case did not support a jury instruction for voluntary manslaughter based on "heat of passion" and this ruling was upheld in Kemp's direct appeal.

Under all of the facts and circumstances of this case, even if defense counsel had not opened the door to the introduction of Kemp's statements at the 2009 dependency hearing, the court found that there was not a reasonable probability that the outcome of these proceedings would have been different. Therefore, Kemp was not prejudiced by counsel's actions, and he was not entitled to a new trial.

DATE: 6-28-17

By The Court,

Marc F. Lovecchio, Judge

cc: Kenneth Osokow, Esquire (ADA)
Donald Martino, Esquire
Work file
Gary Weber, Esquire (Lycoming Reporter)
Superior Court (original & 1)